IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TONY ROGERS, #N-34139, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 20-cv-34-SMY |
| | ) |
| BROOKHART, STEPHEN RITZ, | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| and WARDEN OF LAWRENCE | ) |
| CORRECTIONAL CENTER, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Tony Rogers, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed the instant lawsuit pursuant to 42 U.S.C. § 1983. He alleges that Defendants Dee Dee Brookhart, Stephen Ritz, D.O. and Wexford Health Sources Inc. were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Now pending before the Court are Defendants' motions for summary judgment (Docs. 69 and 71). Rogers has responded in opposition (Docs. 75-77). For the following reasons, the motions are **GRANTED**.

## Factual Background

Construed in the light most favorable to Rogers, the evidence and reasonable inferences establish the following facts relevant to the pending motions: Rogers has been incarcerated with the IDOC since 2010 (Doc. 73-1, p. 8). He was housed at Lawrence Correctional Center from 2010 to December 2, 2021. *Id.* at p. 9.

Defendant Stephen Ritz, D.O. is a physician with a background in family medicine (Doc. 72-2, p. 4). He has been employed by Wexford Health Sources, Inc. since 2014 and has been the

Chief Medical Officer since July 2020. *Id.* at pp. 7-8. Dr. Ritz served as the Corporate Medical Director for Utilization Management from 2014 to July 2020 (Doc. 72-2, p. 9). Defendant Dee Dee Brookhart has been the warden at Lawrence since January 1, 2019 (Doc. 73-2, p. 5).

### Rogers' Medical Treatment

Rogers has complained of painful knee pain resulting from multiple past surgeries and injuries (Doc. 72-5). He complained of right knee pain or dysfunction to medical professionals employed by Wexford and working at Lawrence on multiple occasions (Docs. 72-5, 72-3).

On April 2, 2018, Rogers presented to Nurse Practitioner Sara Stover and reported that he had been shot in his left knee and right thigh and had pins in both legs after a car accident. Stover ordered an x-ray of both knees (Doc. 72-5, p. 1). X-rays were taken of Rogers' knees on April 4, 2018. *Id.* at p. 300. The right knee x-ray showed three metallic screws, advanced osteoarthritis, suggestion of new bone formation along the medial and lateral aspect of the distal femur and mild degree of varus deformity (misaligned tibia) with near complete loss of joint spaces. The left knee x-ray showed moderate tricompartmental osteoarthritis with small joint effusion (extra fluid around joint). *Id.* at p. 194.

Stover saw Rogers again on April 16, 2018 and noted that he had advanced osteoarthritis in his right knee and that there were "many other issues on x-ray as well." (Doc. 72-5, p. 5). Stover prescribed Cymbalta 30mg (medication used for neuropathic pain) for one year and referred him to physical therapy ("PT") for one month for his right knee. *Id.* at p. 206.

On May 21, 2018, Rogers saw Stover in the chronic clinic. He reported that the Cymbalta helped somewhat, but not enough, and that his left knee pain was worse than normal. Stover ordered a left knee x-ray, increased his Cymbalta dosage to 60mg, and ordered a 1-month follow-up to check his pain and to review the x-ray results. *Id.* at pp. 109-10. An x-ray of Rogers' left

knee was taken on May 24, 2018 and showed that his osteoarthritis was unchanged. *Id.* at p. 298.

On May 31, 2018, Rogers saw Stover for a follow-up for his right knee. He reported that he had not started PT yet, that Cymbalta was working well, and that he also had Ibuprofen. Stover noted that Rogers had a slow, steady gait that seemed to be improved. She ordered to continue Cymbalta and Ibuprofen and to start the PT as ordered. *Id.* at p. 208.

Rogers was evaluated by the physical therapist for his right knee pain on June 20, 2018. The physical therapist noted that his rehabilitation potential was fair but would likely be limited by his excessive weight. She also noted that Rogers should benefit from PT to learn quad strengthening home exercise program ("HEP") to lessen or manage knee pain and slow progression of osteoarthritis. She ordered skilled PT once a week for four weeks. *Id.* at pp. 210-11. PT was discontinued on July 18, 2018 because Rogers refused his call pass. *Id.* at p. 218.

In July 2018, Rogers told his ADA attendant that he had fallen in the shower (Doc. 72-5, p. 15). He was seen by Stover for complaints of knee pain and stated that he needed an MRI for a knee replacement. Stover referred Rogers for a bilateral knee MRI. *Id.* at p. 220. She noted that there were multiple findings found on the bilateral knee x-rays on April 4, 2018, and that an MRI would show any further issues to determine if a knee replacement would be a logical treatment. *Id.* at p. 73.

The MRI referral was denied on August 12, 2018 after being reviewed in Collegial Review by Dr. Ritz and Dr. Ahmed. *Id*. at p. 20. It was noted that Rogers weighed over 500 pounds and that his PT was discontinued due to his refusal to participate. Dr. Ahmed and Dr. Ritz agreed to an alternative treatment plan ("ATP") to treat onsite, educate on weight loss, the need to participate in basic physical therapy, activity modifications, and analgesics as needed. *Id.* at p. 74. Dr. Ritz testified that when considering an MRI, you need to see whether the patient has exhausted all

potential conservative treatments for their complaint prior to surgical evaluation and intervention (Doc. 72-2, pp. 55-57). He also testified that there is not much benefit of an MRI for a patient who is not a candidate for knee surgery because no surgeon, even with significant MRI findings, would take a morbidly obese patient like Rogers for surgery due to the risks from the surgery itself including blood clots, wound healing issues, and infections. *Id*.

On October 3, 2018, Rogers was evaluated by the physical therapist again for chronic knee pain. She noted that his rehabilitation potential was poor to fair because he was poorly compliant with his HEP. Rogers stated that he would "try" to do the HEP three times a day as instructed but "can't make no promises." The physical therapist ordered skilled PT once a week for four weeks. *Id.* at pp. 223-24.

Rogers returned to Stover on December 17, 2018, after completing physical therapy and a home exercise program. Stover noted that Rogers completed physical therapy with no improvement in his knee pain, that his ADL and ability to exercise were still decreased due to knee pain, and that multiple abnormalities were noted on previous x-rays. *Id*. at p. 77. She referred him for an MRI and gave him a permit for the ADA helper (Doc. 72-5, at p. 33).

The MRI referral was denied on December 17, 2018 after being reviewed in Collegial Review by Dr. Ritz and Dr. Vipin Shah. The doctors agreed on an ATP for "BMI, aggressive weight management program and to lose at least 10% weight, participation in ADL's." *Id.* at p. 78. Dr. Shah made a note in Rogers' chart to schedule Rogers to see him to discuss the ATP. *Id.* at p. 34.

On January 7, 2019, Rogers was seen by a nurse complaining of knee pain and requested a wheelchair due to increased pain with his walker. He was given a four-day medical lay-in permit. *Id.* at p. 314.

On January 22, 2019, Rogers saw Stover and reported that Cymbalta was helping and now that he stopped taking it, the pain was worse. He again requested a wheelchair. Upon examination, Stover noted that Rogers bilateral leg edema was worse on the left leg. She noted that they discussed the Collegial Review non-approval of the MRI and Roger's need to exercise and lose weight. Stover prescribed Cymbalta 50mg for one year and a "wheelchair (if possible")" (Doc. 72-3, p. 8). She ordered a 6-week follow-up. *Id.* at p. 8. Stover did not place a referral for Rogers to receive a wheelchair at that time (Doc. 72-3). Stover noted on March 5, 2019, that Rogers "had chronic knee pain which will most likely only be resolved completely with surgery until then pain can be minimally controlled with medication. Weight loss also necessary but due to knee pain he is unable to exercise." *Id* at p. 9. On April 2, 2019, Rogers was seen by Stover for his routine physical examination. Stover noted that he was morbidly obese and had chronic knee pain. She renewed his permits for low bunk, low gallery, cane, elevator pass, walk in dayroom, ADA helper, ADA gym, three mattresses, waist chains, C-PAP machine, water for C-PAP machine, and stool for phone calls, showers, and dayroom for one year. *Id.* at pp. 1-2, 316.

Rogers fell in the shower in November 2019 and hit his left knee against the wall. Dr. Lynn Pittman treated his knee by prescribing Doxycycline antibiotic for 10 days to treat a possible septic joint.

In December 2019, Rogers saw Stover for complaints of increased left knee pain since falling in the shower. Stover prescribed Tramadol 50 mg to be taken twice a day for 6 months, ordered an x-ray of the left knee, and ordered a 3-week follow-up. *Id*. at p. 29. The x-ray findings showed moderate tri-compartmental osteoarthritis with no acute bony fracture. It was noted that there was perhaps a joint effusion. *Id*. at p. 195.

Rogers saw Stover on February 4, 2020 and requested an attendant and a wheelchair.

Stover discussed his requests with Dr. Pittman, increased his Tramadol prescription to 100mg twice a day as needed for six months, ordered an ADA attendant and oversized wheelchair, and ordered a 6-week follow-up. *Id.* at pp. 31, 335. Her referral for an oversized wheelchair was approved by Wexford on February 12, 2020. *Id.* at pp. 80-81.

In March 2020, Rogers injured his right knee. Dr. Pittman ordered for him to be provided Clonidine (antihypertensive), Hydralazine (vasodilator), and Tylenol #3 (acetaminophen and codeine), and for him to be sent to Richland Memorial Hospital for an evaluation. *Id.* at pp. 33-35, 82-83, 341-342. The physicians at the hospital diagnosed Rogers with a knee sprain and did not order an MRI. *Id.* at pp. 84-85. Rogers returned to Lawrence that day and was admitted to the infirmary for observation. *Id.* at pp. 37-53.

In July 2020, nurse practitioner Carissa Luking examined Rogers after another fall. She noted that he was tender at his inner aspect of his right knee on palpation, that was unable to determine swelling due to his size. Due to his surgical history with hardware and inability to stand due to pain, she ordered for Rogers be sent to the hospital for evaluation. *Id.* at pp. 86-87, 137-39. Rogers was sent to Carle Foundation Hospital and was diagnosed with a right knee sprain. An x-ray was taken of his right knee. It was noted that Rogers' surgical hardware was stable and there was severe degenerative arthritis present with no acute fracture or dislocation. The physicians at the hospital did not order an MRI. *Id.* at pp. 88-99.

Rogers testified that he does not believe his knee pain can be cured, that none of the outside medical providers he has seen have recommended or ordered an MRI of his knees, that he has not been told by any medical professional that an MRI was medically necessary for his knee or that any doctors have recommended surgery for his knees (Doc. 72-1, pp. 53-54).

**Rogers' Grievances and Requests for Medical Treatment**

Rogers filed grievances regarding his knee pain in April 2019, November 2019, and February 2020. He requested an MRI and a wheelchair (Doc. 73-2, pp. 1-15). His April 2019 grievances were reviewed by the grievance officer and the Health Care Unit Administrator who noted that Rogers had an ATP regarding weight loss. *Id.* The grievance officer recommended that the grievance was moot because the HCUA indicated that Rogers was being seen and treated by a medical provider for his conditions. *Id.* Rogers second April 2019 grievance was also reviewed by the grievance officer who reached out to Brookhart, the ADA coordinator, for a response related to Rogers' request for a wheelchair (Doc. 73-3, p. 207-208). Brookhart responded that a wheelchair could only be ordered if the medical doctor indicated that one was medically necessary. *Id.* Rogers' November 2019 and February 2020 grievances were denied because Rogers did not have a medical permit for a wheelchair and his medical providers had to determine whether a wheelchair was necessary.

Brookhart testified that Wexford, the medical health care provider, are responsible for making decisions regarding inmate health care (Doc. 73-1, p. 11). She further testified that inmates are not denied medical devices because of security risks; if medical personnel determine that an inmate needs a cane or wheelchair, then one is provided by Wexford. *Id*. at pp. 34, 37. She recalled having conversations with Rogers regarding various complaints he raised, including complaints regarding healthcare (Doc. 73-1, pp. 41-42). She recalled that Rogers was morbidly obese, that he complained about a myriad of topics, and that he was transferred after Lawrence became a maximum-security facility. *Id*. at p. 41.

**Discussion**

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue as to any material fact – that is where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). If the evidence is merely colorable or is not sufficiently probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners. *Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An inmate alleging deliberate indifference must show that he faced a "substantial risk of serious harm," and that prison officials knew about that risk and disregarded it by "failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Relatedly, an inmate proceeding on a claim of deliberate indifference to medical needs must offer evidence that he suffered from an objectively serious medical condition, and that the defendant knew of and disregarded a substantial risk of harm. *Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 915 (7th Cir. 2020).

A medical condition is objectively serious if it "has been diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would perceive the need for a doctor's attention." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). An inmate may establish deliberate indifference to such a

condition by demonstrating that the treatment he received was "blatantly inappropriate." *Greeno,* 414 F.3d at 654.

Medical professionals are entitled to deference in treatment decisions unless "no minimally competent professional would have so responded under those circumstances." *Sain v. Wood,* 512 F.3d 886, 894–95 (7th Cir. 2008). Disagreement between an inmate and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006). Courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor was exercising his professional judgment. *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011).

**Defendants Ritz and Wexford's Motion for Summary Judgment (Doc. 71)**

The parties do not dispute that Rogers' knee pain presented an objectively serious medical condition. Rogers asserts that Dr. Ritz completely disregarded his medical condition by denying the MRI referrals without ever examining or speaking with him. He also contends that Dr. Ritz made his decision without the benefit of x-ray imaging or reports and was not familiar with his prior medical condition.

In his role as the Utilization Management Medical Director, Dr. Ritz was involved in two collegial review calls with Rogers' treating physicians Dr. Ahmed and Dr. Shah. During the calls, the treating physicians presented the MRI referrals made by Stover for a bilateral knee MRI. Dr. Ritz and the treating physicians discussed Rogers' medical history, including his morbid obesity and refusal at times to participate in PT, and agreed upon an alternative treatment plan.

Dr. Ritz testified that pain itself is not a reason to order advanced imaging before considering other treatments and that an MRI is not beneficial for a patient who is not a candidate for knee surgery. Therefore, considerations are made whether the patient would be a surgical candidate when determining whether advanced imaging is necessary. Rogers would not be a surgical candidate for knee surgery as there are extreme risks due to his morbid obesity including perioperative and rehabilitation complications.

"An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is "a classic example of a matter for medical judgment."" *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) *quoting Estelle,* 429 U.S. at 107. There is no evidence in the record from which a jury could reasonably conclude that Dr. Ritz's exercise of medical judgment in declining to refer Rogers for an MRI departed significantly from accepted professional norms. His decision in collegial review to deny the MRI referrals were accepted by Rogers' treating physicians and Stover; although they could have, none of his providers appealed Dr. Ritz's decisions. And no outside physician ever ordered an MRI or discussed with Rogers the possibility of knee surgery when he was sent to outside hospitals in 2020. Because Dr. Ritz was not deliberately indifferent to Rogers' medical needs, Wexford cannot be liable. *Pyles*, 771 F.3d at 412 (holding that the defendant physician was not deliberately indifferent, and that Wexford cannot be held liable for damages because there is no underlying constitutional violation) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

**Defendant Brookhart's Motion for Summary Judgment (Doc. 69)**

Rogers asserts that Brookhart was deliberately indifferent to his serious medical needs when she denied his grievances requesting a wheelchair even though he specifically referenced the request by Stover. Brookhart recalls having conversations with Rogers regarding various

complaints he raised, including complaints about healthcare. That said, even if she knew specifically about his request for a wheelchair, that knowledge alone would not support a finding of deliberate indifference. Brookhart was not a medical care provider. She reviewed the grievance officers' recommendations, which were based on information received from the HCUA regarding Rogers' medical treatment. The medical records indicated that a wheelchair had not been ordered by Rogers' treating medical providers and that he was under the care of medical staff. A non-medical prison official is not deliberately indifferent for relying upon medical staff to make appropriate decisions regarding treatment. *See Greeno,* 414 F.3d at 656; *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) ("[T]he alleged mishandling of Owens's grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."); *Johnson v. Snyder,* 444 F.3d 579, 586 (7th Cir. 2006) (holding that where warden knew of problem but believed medical staff was attending to prisoner's needs, the warden was not deliberately indifferent). Accordingly, Brookhart is entitled to summary judgment as well.

## Conclusion

For the foregoing reasons, the motions for summary judgment filed by Defendant Dee Dee Brookhart (Doc. 69) and Defendants Stephen Ritz and Wexford Health Sources, Inc. (Doc. 71) are **GRANTED**. As no claims remain, the Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED:  August 18, 2023**

**STACI M. YANDLE**
**United States District Judge**